IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|                        |     |                                    |
|------------------------|-----|------------------------------------|
| PATRICK TRAWICK,       | )   |                                    |
|                        | )   |                                    |
|   Petitioner,          | )   |                                    |
|                        | )   |                                    |
| v.                     | )   | Case No. 2:13-cv-02144-STA-cgc     |
|                        | )   |                                    |
| MIKE PARRIS,           | )   |                                    |
|                        | )   |                                    |
|   Respondent.          | )   |                                    |
|                        | )   |                                    |

**ORDER TO MODIFY THE DOCKET,
DENYING PETITION PURSUANT TO** 28 U.S.C. § 2254**,
DENYING A CERTIFICATE OF APPEALABILITY,
CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH
AND
DENYING LEAVE TO PROCEED** *IN FORMA PAUPERIS* **ON APPEAL**

Before the Court is the Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254

("§ 2254 Petition") filed by Petitioner, Patrick Trawick, Tennessee Department of Correction

prisoner number 213102, an inmate at the Northwest Correctional Complex ("NWCX") in

Tiptonville, Tennessee. (§ 2254 Pet., *Trawick v. Parris,* No. 2:13-cv-02144-STA-cgc (W.D.

Tenn.), ECF No. 1.) For the reasons stated below, the Court **DENIES** the § 2254 Petition.

I.        **BACKGROUND**

A.        **State Court Procedural History**

On November 14, 2002, a grand jury in Shelby County, Tennessee, returned two

indictments against Trawick. Case Number 02-08616 charged Trawick with the first degree

murder of Tujuana Smith. (Indictment, *State v. Trawick*, No. 02-08616 (Shelby Cnty. Crim. Ct.),

ECF No. 11-1 at PageID 61-62.) Case Number 02-08617 charged Trawick with aggravated

assault against Smith (Count 1) and Darryl Turner (Count 2). (Indictment, *State v. Trawick,* No. 02-08617 (Shelby Cnty. Crim. Ct.), ECF No. 11-1 at PageID 63-65.) On July 16, 2003, the State filed notices of its intent to seek enhanced punishment and life imprisonment without the possibility of parole. (Not. of Intent to Seek Enhanced Punishment, *State v. Trawick*, Nos. 02-08616, -08617 (Shelby Cnty. Crim. Ct.), ECF No. 11-1 at PageID 149-50; Not. of State's Intention to Seek Life Without Parole, *id.*, ECF No. 11-1 at PageID 151-53.)

A jury trial commenced in the Shelby County Criminal Court on February 25, 2008. On February 29, 2008, the jury returned guilty verdicts on all charges. (Trial Tr. 723-25, *id.*, ECF No. 11-7 at PageID 1063-65.) At a penalty-phase hearing on February 29, 2008, the jury sentenced Trawick to life imprisonment without the possibility of parole on the murder count. (*Id.* at 798-99.)

On April 3, 2008, the State filed a motion for consecutive sentencing. (Mot. for Consecutive Sentencing, *Trawick v. Parris*, No. 2:13-cv-02144-STA-cgc (W.D. Tenn.), ECF No. 11-1 at PageID 170-71.) At a sentencing hearing on April 22, 2008, the trial judge sentenced Trawick to concurrent terms of six years for the two aggravated assaults, with the sentences for the aggravated assaults to run consecutively to sentence for the murder conviction, for a total sentence of life without parole plus six years. (Sentencing Hr'g Tr. 12-13, *id.*, ECF No. 11-8.) Judgments were entered on November 16, 2008. (J., *State v. Trawick,* No. 02-08616 (Shelby Cnty. Crim. Ct.), ECF No. 11-1 at PageID 172; J., *State v. Trawick,* No. 02-08617 (Shelby Cnty. Crim. Ct.) (Count 1), ECF No. 11-1 at PageID 173; J., *id.* (Count 2), ECF No. 11-1 at PageID 174.) The Tennessee Court of Criminal Appeals ("TCCA") affirmed. *State v. Trawick,* No.

W2008-02675-CCA-R3-CD, 2010 WL 2349188 (Tenn. Crim. App. June 9, 2010), *appeal denied*

(Tenn. Nov. 18, 2010).

The TCCA summarized the evidence introduced at trial:

Darryl Turner testified that he and Tujauna Smith, the deceased victim and the Defendant's ex-girlfriend, began dating four to six weeks before her death on September 30, 2002. He recalled that he had known the Defendant since 1999 when they met in prison. After Mr. Turner's release from prison, he and the Defendant became reacquainted. Mr. Turner stated that the Defendant was not happy about his relationship with the victim, but that he and the Defendant had never had any serious problems between one another. He stated that he offered to stop seeing the victim, but the Defendant told him that was not necessary. Mr. Turner and the victim continued to date. He also testified that on the day before the victim's death, the Defendant had been to Mr. Turner's mother's home and confronted the victim about her failure to bring their thirteen-month-old daughter to see him.

Mr. Turner testified that on September 30, 2002, the victim picked him up at his mother's house to go out to dinner. Not far from the home, the Defendant pulled up next to the victim in an attempt to get her to talk to him. She told the Defendant that she had nothing to say to him. Mr. Turner recalled urging the victim to talk to the Defendant in order to see what he wanted. However, the victim told Mr. Turner that the Defendant looked like he was reaching for a gun so she sped away.

Mr. Turner testified that the Defendant pursued them while the victim drove frantically, speeding to get away from the Defendant. During the pursuit, the victim stopped and the Defendant shot at them. Mr. Turner then told her to drive to the North Precinct of the Memphis Police Department. He recalled that as the victim sped toward the precinct, the Defendant maintained his pursuit. When the victim attempted to turn quickly, she hit a curb. Mr. Turner testified that he jumped out of the car and ran through the woods to the precinct. As he approached the precinct, the victim drove past him with the Defendant still following her.

Mr. Turner testified that he arrived at the precinct to report that he and the victim had been chased and shot at by the Defendant. About ten minutes after his arrival at the precinct, he recalled the officers telling him that there had been a shooting at a nearby Mapco gas station. He testified that not long after hearing of the shooting, the officers told him that the victim had been killed. After giving a full statement to the police, Mr. Turner identified the Defendant from a photographic lineup as the man who had chased and shot at them. Several months later, while both men were in jail, the Defendant told Mr. Turner that he never

intended to harm Mr. Turner and that his problem was with the victim. During the conversation, the Defendant asked Mr. Turner not to testify against him. Mr. Turner stated that he felt obligated to testify because the victim had saved his life.

The deceased victim's cousin, Ranelle Duncan, testified that the victim had just turned nineteen-years-old on September 7, 2002. She said that the victim had two daughters, ages four-years-old and eleven-months-old. The younger daughter's father is the Defendant. Ms. Duncan said that the victim began living with her about three or four weeks before her death. She recalled that the victim and the Defendant argued sometimes but described their arguments as "nothing big." Ms. Duncan said that the victim began dating Darryl Turner about the time she moved into her residence. Ms. Duncan testified that the Defendant came by her home about a week before the victim's death. He dropped off some diapers for the baby and wanted to talk to the victim who was not home at the time. Ms. Duncan recalled that the Defendant was upset about the victim's absence and told her that the victim was "going to make me kill her." Ms. Duncan testified that she did not take his comment seriously and that she was not afraid of the Defendant that day at her house. Ms. Duncan said that she saw the victim and Mr. Turner earlier on the evening of the victim's death. She learned that the victim had been shot and killed sometime around 2:00 a.m. the next morning.

Raymond E. Williamson testified that he was an assistant manager at the Mapco Gas Station where the victim was killed. He had gotten off work at 10:00 p.m. but was at the store waiting for another employee whom he drove to work to end his shift at 11:00 p.m. He recalled seeing two cars pull up outside the store and seeing a man and a woman in an argument. Although he could not hear what was being said, he could tell they were arguing by their loud voices and hand gestures. Mr. Williamson said that the victim appeared very afraid and moved her hands in a defensive gesture. He described the Defendant as "agitated."

Mr. Williamson testified that the victim entered the store and the Defendant followed her with a gun in his hand. Mr. Williamson described the gun as a chrome-plated .45 caliber handgun that the Defendant held close to his chest as he entered the store. Near the front counter, the Defendant grabbed the victim and pistol-whipped her. Mr. Williamson testified that the Defendant told the victim to "get the f* * * out of the store." Mr. Williamson began pushing the panic button to alert the police when the confrontation became physical. The victim broke away from the Defendant and ran to the back of the store. The Defendant followed her, broke the glass from a beer cooler, and soon caught up to the victim. Mr. Williamson testified that the Defendant shot the victim six or seven times, with the victim falling to the ground with the third shot. He said that the Defendant emptied his gun and ran from the store.

Mr. Williamson testified that he locked the doors of the store as soon as the Defendant exited the building. He recalled that the video surveillance cameras recorded the entire incident. The video was played for the jury during which time Mr. Williamson recalled that the Defendant held the victim for the first two or three shots and then let her fall to the ground as he continued to shoot. He acknowledged that he was initially unable to identify the Defendant due to medication he took that affected his short-term memory. However, he identified the Defendant at trial.

Rodney Middlebrook testified that he was an employee at the gas station on the night that the victim was killed. He recalled that the victim and the Defendant came into the store at about 10:45 p.m. and that the victim was scared. He saw the Defendant pistol-whip the victim. When Mr. Middlebrook "hopped" the counter to escape the store, he heard gunshots. The Defendant left the store and drove away.

Torrance Holmes testified that he was a customer at the gas station and witnessed the altercation from the parking lot. He recalled that two cars came racing down the wrong side of the road and pulled into the parking lot. Mr. Holmes testified that the victim was scared. He said that the Defendant was angry with the victim and wanted to know why she was with another man. The Defendant also questioned whether his baby was in the victim's car with the couple. Mr. Holmes testified that the Defendant threatened to kill the victim and chased her into the store. From the parking lot, Mr. Holmes saw the Defendant choke and pistol-whip the victim. He saw the victim break free and run to the back of the store only to be chased and shot by the Defendant. He testified that the Defendant left the store and immediately went to check the backseat of the victim's car as if to see if the baby was inside the car. Finding no one else in the victim's car, the Defendant left the scene in his car. Mr. Holmes testified that he was trained in cardio-pulmonary resuscitation (CPR) so he entered the store to check on the victim. He described the scene as very bloody. When he checked the victim's condition, she had no pulse.

Rodarius Ellis testified that he was at the Mapco store talking to his friend, Torrance Holmes, when two cars drove into the parking lot. He said that he saw a man follow a woman into the store. He recalled that the man pistol-whipped the woman and followed her to the back of the store where he shot her. Before leaving in his car, the man checked the woman's backseat, as if he was looking for someone. Mr. Ellis said that he started to leave the store but returned at his girlfriend's urging because he knew CPR. However, when he returned to the store and checked the victim, she was already dead.

Memphis Police Department Officer Patrick Taylor testified that he responded to a report of a shooting at the Mapco station at approximately 10:30

p.m. When he arrived at the scene, everything looked normal so he assumed that the call had been a false alarm. However, Officer Taylor stated that when he entered the store, the clerk told him, "She's back there." In light of the clerk's calm demeanor, Officer Taylor still thought that the clerk was referring to a shoplifter; but as he rounded the corner of the aisle to the back of the store, Officer Taylor saw a lot of blood and the victim's body. He secured the scene, separated the witnesses, and called an ambulance to the scene.

Sergeant Connie Justice of the Memphis Police Department testified that she was assigned the investigation of the case and acted as case coordinator. Sgt. Justice testified that, based upon the investigation that occurred throughout the night of the shooting, the police had centered their investigation on the Defendant by morning. However, the Defendant proved difficult to locate and was not arrested until May 2003. Cedric Thompson testified that he reported his white Mercury Mystique stolen some time before the victim's death. He also said that he never gave the Defendant permission to drive his car. Sgt. Justice testified that a Mercury Mystique found abandoned near the scene was processed and that a bullet found in the vehicle was matched to those taken from the victim's body. She said that there were no fingerprint comparisons made from any found on the vehicle.

Memphis Police Department Officer Steven Ford testified that he helped secure the scene at the Mapco station and also spoke to Mr. Turner at the precinct. He said that he went to the area where Mr. Turner told him the victim had run over the curb and confirmed that there were skid marks on the road. He also retrieved a "slug" from the drywall of the store and sent it to the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis. Officer Shan Tracy testified that he completed the crime scene sketch of the Mapco station which was admitted into evidence at the trial. He recalled finding the victim's car keys in a pool of blood. He also stated that no shell casings or bullets were found in the parking lot of the store.

Francis Donald Carpenter testified that he was the crime scene technician with the Memphis Police Department who processed the abandoned Mercury Mystique. He discovered a shell casing on the driver-side floor of the vehicle and one round of ammunition imbedded in the passenger-side door. The bullet had also shattered the passenger-side window. He recalled that the driver-side window was shattered also but found no evidence that a bullet had traveled through the window. He opined that the noise and force of firing a gun inside the vehicle could have caused the driver-side window to shatter. TBI firearms technician Alex Brodhag testified that he analyzed the bullets and casings found at the scene and in the Mercury Mystique. He determined that the casings and bullets were fired from the same .45 caliber handgun.

Dr. O'Brian Cleary Smith testified that he served as the Shelby County Medical Examiner from 1983 until February 2004, but was privately employed at the time of trial. He performed the autopsy on the victim and determined that she had suffered four gunshot wounds. One bullet entered at the top of her head and traveled at an angle to rest in her brain. A second bullet entered near her right shoulder, severed her spinal cord and came to rest in her chest cavity. A third bullet entered her right shoulder and exited her back. The fourth bullet entered the front of her right leg and exited the back of her leg. Although unable to determine the order in which the wounds were inflicted, Dr. Smith opined that the wound to her head would have produced instant death; the wound to her spinal cord would have been fatal eventually; but the two other wounds would have been survivable.

The Defendant recalled Ms. Duncan to testify more extensively about her conversation with the Defendant the week before the victim's death. She stated that the Defendant was angry that the victim and their baby was not home when he came by with the diapers and that he told Ms. Duncan the victim was going to make him kill her. She admitted that she did not take his comment seriously. However, when asked to describe the Defendant's behavior toward the victim, Ms. Duncan testified that the Defendant was jealous. On cross-examination, Ms. Duncan described the Defendant as disappointed that the victim was not at home. She also admitted that she "never dreamed that [the Defendant] would chase [the victim] through a Mapco and gun her down."

Based upon this proof, the jury convicted the Defendant, as indicted, of premeditated first degree murder and two counts of aggravated assault. Following the bifurcated sentencing hearing, the jury found beyond a reasonable doubt the existence of one statutory aggravating circumstance, that the Defendant was previously convicted of the prior violent felony of rape, and the jury unanimously agreed that life without the possibility of parole was the appropriate sentence.

*State v. Trawick*, 2010 WL 2349188, at *1-5.

On May 26, 2011, Trawick, through Robert Brooks, his retained counsel, filed a petition in the Shelby County Criminal Court pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122. (Pet. for Relief from Conviction or Sentence, *Trawick v. State*, No. 02-08616 (Shelby County Crim. Ct.), ECF No. 11-16 at PageID 1327-33.) The State filed its response on July 13, 2011. (Resp. of State of Tenn. to Pet'r's Pet. for Post-Conviction Relief, *id.*, ECF No. 11-16 at PageID 1335-37.) A hearing on the post-conviction petition was

held on September 29, 2011. (Post-Conviction Hr'g Tr., *id.*, ECF No. 11-18.) The post-conviction court denied relief on November 14, 2011. (Order Denying Pet. for Post-Conviction Relief, *id.*, ECF No. 11-16 at PageID 1357-62.) The TCCA affirmed. *Trawick v. State,* No. W2011-02670-CCA-R3-PC, 2012 WL 3792095 (Tenn. Crim. App. Aug. 31, 2012).

Although not disclosed by either party, Trawick, through his attorney, Robert Brooks, subsequently filed a petition for a writ of error *coram nobis* in the Shelby County Criminal Court in which he alleged that he had newly discovered evidence, in the form of an affidavit by Darryl Turner, "purporting to equivocate his eyewitness identification of [Trawick] as the driver of the vehicle and the individual who had fired a weapon at the victim and him." *Trawick v. State,* No. W2014-01454-CCA-R3-ECN, 2015 WL 47691196, at *2 (Tenn. Crim. App. Aug. 12, 2015). At the hearing on the *coram nobis* petition, the trial court denied Turner's request for a thirty-day continuance to "consider his position," including the possibility that he might be charged with aggravated perjury. Turner exercised his Fifth Amendment right against self-incrimination and declined to testify. The trial court dismissed the petition, and the TCCA affirmed. *See id.* at *5.

### B. Procedural History of Trawick's § 2254 Petition

On March 7, 2013, Trawick, through his attorney, Robert Brooks, filed his § 2254 Petition and paid the habeas filing fee. (§ 2254 Pet., *Trawick v. Parris,* No. 2:13-cv-02144-STA-cgc (W.D. Tenn.), ECF No. 1.) On June 7, 2014, Trawick filed a motion asking that Respondent be directed to respond to the § 2254 Petition. (Mot. for Order to Show Cause, *id.*, ECF No. 4.) In an order issued on June 12, 2014, the Court granted Trawick's motion and directed Respondent,

NWCX Warden Henry Steward, to file the state-court record and a response to the § 2254 Petition. (Order, *id.*, ECF No. 5.)[1]

On August 8, 2014, Warden Steward filed his Answer to Petition and most of the state-court record. (Answer, *Trawick v. Parris,* No. 2:13-cv-02144-STA-cgc (W.D. Tenn.), ECF No. 10; Not. of Filing, *id.*, ECF No. 11.)[2] Trawick did not file a reply.

## II.        PETITIONER'S FEDERAL HABEAS CLAIMS

In his § 2254 Petition, Trawick raises the following issues:

1.     "Ineffective Assistance of Counsel" (§ 2254 Pet. 15, *id.*, ECF No. 1; *see also id.* at 15-18); and
2.     "Violation of Due Process" (*id.* at 18; *see also id.* at 19-22).

## III.        THE LEGAL STANDARD

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A.        Waiver and Procedural Default

Twenty-eight U.S.C. § 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner

---

[1] The Clerk is directed to modify the docket to substitute current NWCX Warden Mike Parris for Henry Steward as respondent. *See* Fed. R. Civ. P. 25(d).

[2] The state-court record did not include records pertaining to the petition for writ of error *coram nobis*.

must "fairly present"[3] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except when the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) (the *Adams* holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes that court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *see Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts,

---

[3] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred.   *Coleman*, 501 U.S. at 732; *see Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice.   *Schlup v. Delo*, 513 U.S. 298, 322 (1995); *Coleman*, 501 U.S. at 750.   The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime.   *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

## B.    Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (internal quotation marks and citations omitted).[4]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-82, 185. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).[5] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412-13. The state court's application of clearly established federal law must be "objectively unreasonable." *Id.* at 409. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Williams*, 529 U.S. at 411. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an

---

[4] The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[5] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (same); *Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010) (same).

error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In *Rice v. Collins*, 546 U.S. 333, 341-42 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[6]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010); *see Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

---

[6] In *Wood*, 668 U.S. at 293, 299, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Court ultimately found it unnecessary to reach that issue. *Id.* at 300-01, 304-05. In *Rice*, 546 U.S. at 339, the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable.

**IV.**          **ANALYSIS OF PETITIONER'S CLAIMS**

**A.      The Alleged Due Process Violation (Claim 2)[7]**

In Claim 2, Trawick argues that his right to due process was violated when the trial judge

ruled that his prior conviction for rape could be used for impeachment purposes if he testified.   (§

2254 Pet. 19-22, *Trawick v. Parris,* No. 2:13-cv-02144-STA-cgc (W.D. Tenn.), ECF No. 1.)

Trawick raised the issue on direct appeal, and the TCCA denied relief, reasoning as follows:

> The Defendant argues that the trial court erred in ruling a prior rape
> conviction admissible as impeachment evidence pursuant to Tennessee Rule of
> Evidence 609.   He contends that the trial court failed to weigh properly the
> probative value of the prior conviction versus its prejudicial effect and that "the
> obvious behavioral nexus between the rape of a woman and the first degree murder
> of a woman" concerning violent behavior inflicted against women rendered the
> prejudicial effect of the evidence too great to allow admission.   The State contends
> that the trial court properly determined that the rape conviction could be admitted
> as impeachment and that if any error occurred, it was harmless in light of the
> overwhelming proof of the Defendant's guilt.   The Defendant argues that this error
> cannot be deemed harmless in light of his decision not to testify caused by the
> ruling.   Therefore, he argues that the jury was unable to hear his version of events,
> which differed dramatically from the proof presented by the State, specifically
> concerning his state of mind.

> The record reflects that during a pretrial hearing on the issue the trial court
> ruled admissible the Defendant's 1995 rape conviction based upon its
> characterization that rape was "a crime of moral turpitude" and that "someone
> [who] commits a rape would not be someone who would be considered particularly
> moral."   The trial court also ruled that "just because it's a felony makes it
> admissible" and "weighing that against the unfair prejudice, I think it should be
> admissible if [the Defendant] elects to testify."   Following the Defendant's
> decision not to testify—which he attributed to the trial court's ruling—the trial
> court elaborated on its ruling and stated that because Mr. Turner testified candidly
> about his prior criminal record and having met the Defendant while in prison, the
> trial court thought it "unfair" that the Defendant would be allowed to testify subject
> only to impeachment by his 1993 theft conviction.   The trial court ruled that the
> rape conviction was probative of the Defendant's truthfulness and that the
> probative value of the evidence outweighed the prejudicial effect.

---

[7] In the interest of clarity, the Court will address Claim 2 before Claim 1.

Although the Defendant declined to present an offer of proof during the trial, he reserved the right to do so at the motion for new trial hearing. However, at the motion for new trial hearing, the trial court refused to allow the Defendant to present his offer of proof. Instead, the trial court permitted counsel to summarize the Defendant's testimony. Defense counsel stated that the Defendant would have testified that he and the victim had a tumultuous three-year relationship that had only recently ended when she died. He would have testified that after their break-up, he had great difficulty seeing their ten-month-old daughter because the victim would keep the child from him and refuse him access to the child. He would have testified that on the night of the victim's death he saw the victim while driving, and that the victim and Mr. Turner actually chased him and fired the first shots. The Defendant also would have testified that the victim telephoned him on his cellular phone and told him to follow her to the Mapco station. He admitted that the couple argued about their daughter and the victim's relationship with Mr. Turner. However, the Defendant would have testified that the victim made a remark to him that their child had performed sexual acts with Mr. Turner, and the Defendant just "snapped," following her into the store and ultimately shooting her.

Rule 609(a)(3) of the Tennessee Rules of Evidence allows for the admission of a prior conviction to impeach the credibility of a defendant testifying at trial. Prior to its admission, the trial court is required to determine whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on substantive issues." Tenn. R. Evid. 609(a)(3). This court will only reverse a trial court's decision only if the trial court abused its discretion. *State v. Williamson*, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

In determining whether the probative value of a prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues, a trial court should consider (1) the relevance of the impeaching conviction with respect to credibility, and (2) the similarity between the crime in question and the underlying impeaching conviction. *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). This court has held that a prior rape conviction may be admissible for impeachment purposes under Rule 609. *State v. O.B. Freeman Green, Jr.*, No. 02C01–9901–CC–00036, 1999 WL 675352, at *3 (Tenn. Crim. App. Sept. 9[,]1999), *perm. app. denied* (Tenn. Apr. 24, 2000). The fact that a prior conviction involves the same or similar crime for which the defendant is being tried does not automatically require its exclusion. *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997); *State v. Miller*, 737 S.W.2d 556, 560 (Tenn. Crim. App. 1987). However, if "the prior conviction and instant offense are similar in nature the possible prejudicial effect increases greatly and should be more carefully scrutinized." *Long v. State*, 607 S.W.2d 482, 486 (Tenn. Crim. App. 1980). The trial court must analyze the prior conviction and the offense on trial to determine if the conviction's probative value on credibility is outweighed by the danger of unfair prejudice.

In this case the trial court determined that the Defendant's prior conviction for rape was a "crime of moral turpitude" and probative of the Defendant's credibility. The trial court further determined that the rape conviction should be admissible because the impeachment of the Defendant should not be limited to only his 1993 theft conviction. We cannot conclude under the circumstances of this case that the trial court abused its discretion in determining that the probative value of the Defendant's rape conviction relative to credibility outweighed any danger of unfair prejudice to the Defendant. Accordingly, the Defendant is not entitled to relief on this issue.

*State v. Trawick,* 2010 WL 2349188, at *7-8.

In his § 2254 Petition, Trawick does not take issue with the TCCA's holding on direct appeal. He argues, however, that,

[e]ven if admitting the prior rape conviction was proper under state law, the effect of allowing this was to violate petitioner's due process rights. Petitioner's interest in a fair trial far outweighed any interest the state had in introducing the nature of his prior conviction, i.e., rape. And petitioner's trial could not be fundamentally fair without his testimony.

(§ 2254 Pet. 19, *Trawick v. Parris,* No. 2:13-cv-02144-STA-cgc (W.D. Tenn.), ECF No. 1; *see also id.* at 21-22 (same).)

In his Answer, Respondent argues that Trawick raised his challenge to the trial court's evidentiary ruling on direct appeal solely as a state-law issue and, because there is no longer any means of exhausting his federal constitutional claim, it is barred by procedural default. (Answer at 9-10, *Trawick v. Parris,* No. 2:13-cv-02144-STA-cgc (W.D. Tenn.), ECF No. 10.) Respondent's argument is well taken.

[O]rdinarily a state prisoner does not "fairly present" a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so.

*Baldwin*, 541 U.S. at 32 *v. Reese*, 541 U.S. at 32.

> A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003) (internal quotation marks omitted), *abrogated on other grounds by English v. Berghuis*, 529 F. App'x 734, 744-45 (6th Cir. 2013); *see also Pudelski v. Wilson*, 576 F.3d 595, 605-06 (6th Cir. 2009) (same); *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (same).

In his brief to the TCCA on direct appeal, Trawick framed the issue as whether the trial court erred when it ruled that it would allow the prosecution to use a prior rape conviction to impeach him if he chose to testify. (Principal Br. of Appellant at 1, *State v. Trawick,* No. W2008-02675-CCA-R3-CD (Tenn. Crim. App.), ECF No. 11-10 at PageID 1213.) Trawick's analysis relies on Tennessee evidentiary law and the prejudice he suffered because both the rape and Smith's murder involved violence against a woman. (*See id.* at 18-24.) Trawick makes no argument that the trial court's evidentiary ruling violated his right to due process under the United States Constitution. Therefore, Trawick has failed to exhaust a federal constitutional claim.

Claim 2 is without merit and is **DISMISSED**.

B.     **Ineffective Assistance of Counsel (Claim 1)**

In Claim 1, Trawick argues that his attorneys rendered ineffective assistance, in violation of the Sixth Amendment, by advising him not to testify after the trial court ruled that his rape conviction could be used for impeachment. (§ 2254 Pet. 15-18, *Trawick v. Perry,* No. 2:13-cv-02144-STA-cgc (W.D. Tenn.), ECF No. 1.) Trawick raised the issue in his

post-conviction petition.   (Pet. for Relief from Conviction or Sentence at 4, *Trawick v. State,* No. 02-08616 (Shelby Cnty. Crim. Ct.), ECF No. 11-16 at PageID 1330.)   At the post-conviction hearing, the following evidence was presented:

On May 26, 2011, with the assistance of post-conviction counsel, the petitioner filed a petition for post-conviction relief in which he raised a claim of ineffective assistance of trial counsel.   Specifically, he alleged that his trial counsel were deficient for advising him not to testify.   The petitioner asserted that, without his testimony, he was "deprived of a substantial defense and the jury was left with no other choice but to convict as charged."

At the evidentiary hearing, the petitioner testified that he wanted to testify at trial but decided not to based on the advice of his counsel, who told him that it would not be in his best interest given that the trial court had ruled that the State could introduce his prior convictions for rape and burglary.   Had he testified at trial, he would have offered the following testimony:  His ex-girlfriend, Smith, called him on the day of the incident to ask him to meet her at his mother's house so that she could bring their nine-month-old daughter to him.   He called her back, and a man who answered the phone hung up on him.   He called again, and when Smith answered, he said that he hoped she was not prostituting herself for drugs again and that she did not have their daughter around such "stuff."   According to the petitioner, Smith replied that both she and their nine-month-old baby were "sucking [the] man's penis," and then hung up on him.   The petitioner said that when he heard Smith's words about their daughter, it felt as if "a bomb ... exploded inside of [him]."

About twenty minutes later, Smith called the petitioner back and told him to meet her at his mother's house.   En route, the petitioner spotted Smith's car with Smith and what appeared to be two men inside.   He also saw his baby's car seat in the vehicle.   He pulled up, and Smith, who was in the driver's seat, raised her head up, appearing to the petitioner as if she had been in the act of performing oral sex on Darryl Turner, who was in the front passenger seat.   The petitioner said that Turner fired a gun at him and that he then fled in his vehicle, chased by Smith and Turner in their vehicle.   During the ensuing chase, a gun fell out of the visor in the petitioner's vehicle and the petitioner grabbed it.   The petitioner said that Turner fired a couple more shots at him during the chase.   He stated that he returned the gunfire in an effort to make Smith and Turner back off, but that he aimed only at Smith's tires because he believed his baby was in Smith's car.

The petitioner testified that at some point during the car chase, Smith slowed her vehicle and Turner jumped out.   Soon thereafter, a laughing Smith called him on his cell phone and told him to follow her to the Mapco station.   The

petitioner said he accused Smith of having "blow[n] [her] private parts out" by having sex with the men he had seen in her car and that she replied, "Yeah, your daughter's pussy wore out, too" before jumping out of her vehicle and running into the Mapco store. Although he could not remember everything that happened after that, he recalled having followed Smith into the store, hearing some shots during a time that he felt "outside of [himself]," and then running outside to Smith's car to check on his baby, who, as it turned out, was not in the vehicle after all. The petitioner also recalled that he was crying because he was so upset. He said it was never his intention to hurt Smith or anyone else.

The petitioner further testified that he knew that Smith had, in the past, prostituted girls as young as eleven in order to get money to support her drug habit. According to the petitioner, his sister had also warned him to watch his baby when she was around Smith.

On cross-examination, the petitioner acknowledged that it had been his decision not to testify. He reiterated, however, that he had wanted to testify and that he had based his decision not to testify on the advice of counsel.

The petitioner's sister, Takesha Trawick Smith, testified that the victim, Tujauna Smith, called her once to ask if she knew of any young girls that she (Tujauna Smith) could "pimp out." The witness said that she informed the petitioner of that conversation, as well as the fact that she had heard from numerous people that Tujauna was being paid to let men fondle the petitioner's baby. She also told the petitioner that Turner was a pedophile and that he had been having sexual intercourse with her eleven-year-old daughter. She did not, however, inform the petitioner's trial counsel of what she knew about Turner.

The petitioner's senior trial counsel, whom post-conviction counsel stipulated was "one of the finest criminal defense lawyers in Shelby County," testified that he argued at the *Morgan* hearing that the State should not be allowed to use the petitioner's prior rape conviction as impeachment because both it and the crime for which the petitioner was on trial involved violence against women. The trial court, however, disagreed. After its ruling, the court granted counsel a break to talk with the petitioner and his family about the petitioner's decision about testifying. Trial counsel said that both he and the petitioner's family members advised the petitioner not to take the stand in light of the court's ruling. Counsel explained that he informed the petitioner of his opinion that the rape conviction would be "very, very harmful" to the petitioner's case and would outweigh any potential benefit that could be gained by the petitioner's testimony. He said that, had the trial court excluded the rape conviction, his advice to the petitioner would have been different.

Trial counsel further testified that his argument to the jury, which was the only one available to him given the State's strong evidence against the petitioner, was that the shooting had occurred while the petitioner was in a state of passion and intense excitement.

*Trawick v. State*, 2012 WL 3792095, at *1-3.

The post-conviction court denied relief on the merits. (Order Denying Pet. for Post-Conviction Relief at PageID 1360-62, *Trawick v. State,* No. 02-08616 (Shelby Cnty. Crim. Ct.), ECF No. 11-16.) The TCCA affirmed, reasoning as follows:

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40–30–110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In denying the petition, the post-conviction court found that trial counsel's advice to the petitioner about testifying was part of a sound defense strategy based on counsel's experience, and that the decision not to testify was the petitioner's. The court, therefore, concluded that the petitioner had failed to meet the deficient performance prong of the *Strickland* test for ineffective assistance of counsel.

The record fully supports the findings and conclusions of the post-conviction court. The petitioner acknowledged that it had been his decision not to testify, but blamed the decision on the allegedly defective advice of trial counsel. Trial counsel, however, explained that the basis of his decision was the trial court's ruling that the State could impeach the petitioner's testimony with his prior conviction for rape, which counsel believed would be very harmful to the petitioner's case and would outweigh any possible benefit that could be gained by the petitioner's testimony. There was no evidence that trial counsel was in any way unprepared for the case, and post-conviction counsel stipulated to trial counsel's extensive experience and excellent reputation as a criminal defense attorney in Shelby County. As the post-conviction court noted in its order, this court has previously affirmed the denial of post-conviction relief based on a claim of counsel's allegedly defective advice about testifying when the evidence showed that the petitioner knowingly waived the right to testify after heeding the informed advice of counsel. *See Almeer K. Nance v. State*, No. E2008–00857–CCA–R3–PC, 2009 WL 160919, at *5 (Tenn. Crim. App. Jan. 23, 2009), *perm. app. denied*

(Tenn. Apr. 27, 2009); *Mindy Sue Dodd v. State*, No. M2006–02384–CCA–R3–PC, 2007 WL 2949020, at *9 (Tenn. Crim. App. Oct. 10, 2007). We, therefore, agree with the post-conviction court that the petitioner failed to show that counsel was deficient in the advice he gave the petitioner.

*Trawick v. State*, 2012 WL 3792095, at *3-4.

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (internal quotation marks and citations omitted).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[8] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Richter*, 562 U.S. at 104; *see also id.* at 112 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt

---

[8] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

*Richter*, 562 U.S. at 105.

When an ineffective assistance claim is reviewed under § 2254(d), the review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles,* 556 U.S., at ——, 129 S. Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ——, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness

under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

In his § 2254 Petition, Trawick states that he wanted to testify but his attorney advised him that it would not be in his best interest to do so because the trial court had ruled that the jury would get to hear that he had a prior conviction for rape. Trawick took that advice and did not testify. (§ 2254 Pet. 9, *Trawick v. Parris,* No. 2:13-cv-02144-STA-cgc (W.D. Tenn.), ECF No. 1; *see also* Post-Conviction Hr'g Tr. 10-12, *Trawick v. State,* No. 02-08616 (Shelby Cnty. Crim. Ct.), ECF No. 11-18.) Trawick would have testified that the victim flaunted her sexual relationship with Turner and told Trawick that she had allowed Turner to sexually abuse their infant daughter. (*Id.* at 11-12, 13.) Trawick also claims that Turner fired a shot at his car and chased him as he tried to flee. He only shot back at Turner's car in self-defense. (*Id.* at 12.) Trawick claims that, after Turner fled, the victim called to taunt him about the sexual abuse of his daughter, which caused him to shoot the victim in a fit of passion. (*Id.* at 13.)

Trawick also would have testified that he had heard of the victim's alleged abuse of children prior to September 20, 2002. According to Trawick, the victim would prostitute young girls in order to get money for drugs. Trawick also testified that his sister had warned him that he needed to watch the baby when she was around the victim. (*Id.* at 13-14; *see also* Post-Conviction Hr'g Tr. 12-23, *Trawick v. State,* No. 02-08616 (Shelby Cnty. Crim. Ct.), ECF No. 11-18.)[9] Trawick's testimony at the post-conviction hearing was corroborated by that of his

---

[9] During the motion for a new trial, defense counsel, over the State's objection, read a summary of what Trawick's testimony would have been. (11/16/2008 Hr'g Tr. 32-41, *State v.*

sister, Takesha Smith. (§ 2254 Pet. 14-15, *Trawick v. Parris,* No. 2:13-cv-02144-STA-cgc (W.D.

Tenn.), ECF No. 1; *see also* Post-Conviction Hr'g Tr. 32-35, *Trawick v. State,* No. 02-08616

(Shelby Cnty. Crim. Ct.), ECF No. 11-18.)

Trawick has explained why he believes that his attorney's performance was deficient:

> Counsel was ineffective in advising the defendant not to testify. Without the defendant's testimony, a conviction was absolutely inevitable. The defendant was deprived of a substantial defense and the jury was left with no other choice but to convict as charged. There was no sound or legitimate trial strategy or tactic that could possibly justify this decision by counsel.

> Counsel was unable to say that in his opinion any jury in the world would have acquitted the defendant based on the defense he presented. When asked if he thought one might have acquitted had they had the benefit of the defendant's testimony he was not allowed to answer. When asked why he made the argument he made counsel never tried to defend it as a potentially successful argument, but only excused it as the only argument he could make. The problem with this position being, of course, that the reason it was the only argument he could make was because of his own ineffectiveness in recommending against the only defense that had any chance of success.

> Trial counsel was trying to convince a jury that the defendant killed the victim "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211. The tactic he used was abysmally inadequate and doomed to failure. The tactic he advised his client to forego was powerful and persuasive with a substantial likelihood of success resulting in conviction of a lesser included offense.

> To forego the one in favor of the other was not a tactic, it was a terrible mistake, depriving the defendant of his constitutional right to a fair and just trial and a reliable verdict. Overcoming the devastating effects of the video-tape and testimony of the killing required far more than merely anger, jealously [sic], a car chase, and an argument.

> The defendant's testimony was powerful and compelling and if believed could well have convinced the jury that he had been driven into such a state of passion that he acted in an irrational manner. To forsake that defense, in an otherwise hopeless case, merely because he would be impeached by a prior rape

---

*Trawick,* Nos. 02-08616, -08617 (Shelby Cnty. Crim. Ct.), ECF No. 11-9.) That summary is similar, but not identical, to Trawick's testimony at the post-conviction hearing.

conviction simply makes no sense at all. It is utterly unreasonable and unjustified. Once that decision was made, the defendant's fate was sealed. It could have been very different.

Of course, the introduction of the prior rape conviction to impeach would have been harmful, but it was absolutely necessary in order to enable the defendant's testimony and the only real possibility of overcoming the devastating effect of the video tape and the testimony regarding the homicide.

The petitioner respectfully submits that the decision of the Tennessee Court of Criminal Appeals that counsel was not ineffective was not contrary to, or involved an unreasonable application of established federal law, as determined by the United States Supreme Court in *Strickland v. Washington*, *supra*, and its progeny, and was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

(§ 2254 Pet. 18, *Trawick v. Parris,* No. 2:13-cv-02144-STA-cgc (W.D. Tenn.), ECF No. 1.)

Although the § 2254 Petition recites the legal standards from 28 U.S.C. § 2254(d), Trawick has not attempted to apply those standards to the decision of the TCCA on the post-conviction appeal. Trawick has not established that the decision of the TCCA was contrary to *Strickland v. Washington*. This is "a run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams v. Taylor*, 529 U.S. at 406.[10]

Trawick also has failed to satisfy his burden of demonstrating that the decision of the TCCA was an unreasonable application of S*trickland v. Washington* or that it was based on an objectively unreasonable determination of the facts. At trial, defense counsel, William Massey, questioned Trawick about his decision not to testify. Trawick acknowledged that he had been

---

[10] The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id.* at 406; *see also id.* at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

represented by Massey for almost five years and that he had received copies of all discovery provided by the State. (Trial Tr. 636, *State v. Trawick,* Nos. 02-08616, -08617 (Shelby Cnty. Crim. Ct.), ECF No. 11-7.) Trawick had examined the discovery and discussed it with his attorneys. (*Id.*) Trawick and his attorneys had discussed various defense theories that could be used. (*Id.* at 636-37.) Those discussions occurred both prior to and during the trial. (*Id.* at 637.) Trawick listened to the proof presented by the State at trial and to his attorney's cross-examination of the State's witnesses. (*Id.*) Trawick also testified as follows:

> Q. The question now is the state's rested and you have the decision and choice of whether or not you want to testify yourself. Okay. Now, you have a right to testify if you want to. You also have a right not to testify because the government has to prove this case without you saying a word. Okay. And if you decide not to testify, the judge will tell the jury that they can't hold that against you in any way because it's the state's burden to prove it. You understand that?
>
> A. Yes, sir.
>
> Q. You understand that you have a right not to testify and the judge will explain that fully to the jury—
>
> A. Yes.
>
> Q. —and instruct them not to hold that against you?
>
> A. Yes.
>
> Q. You understand also that you have a right to testify if you want to?
>
> A. Yes.
>
> Q. And you can tell your side of the story to this jury. Right?
>
> A. Yes.
>
> Q. You got a side to tell too. Right?
>
> A. Yes, sir.

Q.      You were with us in court earlier.   You were in the court earlier, before the trial started, we addressed what was called for [sic] Morgan issue.   It was a 609 issue about the state being able to use a prior conviction for rape—

A.      Yes, sir.

Q.      —to impeach you in the presence of the jury should you testify?

A.      Yes, sir.

Q.      And the judge ruled that he would indeed allow you to be impeached by that felony conviction?

A.      Yes, sir.

Q.      We talked about what we felt the impact would be on the jury if they heard such a conviction?

A.      Yes.

Q.      And you told me your thoughts?

A.      Yes, sir.

Q.      I've told you my thoughts.   Right?

A.      Yes.

Q.      And you know that I've just went out and talked to your family. They're all sitting back there nodding right now.   There's four of them?

A.      Yes.

Q.      And we got their opinion as to whether or not you should testify.   I won't go into what that is, but I've discussed that with you in the back, have I not?

A.      Yes, sir.

Q.      So you've had the benefit of my talking to you and counseling with you, and Ms. McCluskey when she was here as well as your family's thoughts?

A.      Yes, sir.

Q.      And quite frankly you've given this a lot of thought all along the way yourself, haven't you?

A.      Yes, I have.

Q.      Well, after listening to the proof and after discussing this with me and knowing your family's thoughts, have you made a decision about whether or not you want to testify?

A.      Yes, sir.

Q.      What is your decision?

A.      I'm not going to testify.

Q.      You're not going to testify?

A.      No, sir.

Q.      Is there a reason you're not going to testify?

A.      Well, this that decision I made.

Q.      Okay.   You're not going to testify because of the rape conviction?

A.      Yes, sir.

Q.      Would you testify if the rape conviction were not allowed in against you?

A.      Yes, sir.

Q.      So it's your decision today not to testify because the rape conviction would be allowed in and you think that would have too prejudicial effect—

A.      Yes, it is.

Q.      —on the jury?

A.      Yes, sir.

(*Id.* at 637-41.)

At the post-conviction hearing, Trawick's trial counsel, William Massey, testified that he had been concerned about the effect the rape conviction would have had on the jury:

> Well, we had a 609 hearing, a Morgan hearing, in front of Judge Lammey regarding particularly that rape charge. I was very concerned about the jury hearing of that rape charge because it involved a crime against women. And I felt that it was very, very prejudicial toward Patrick and I argued that it was similar in nature to the violence against women that he was on trial for. But Judge Lammey did not agree with me and advised that he was going to allow the State to use that prior rape conviction, under 609, to impeach Patrick, if he testified at trial. So, after hearing all the proof in the case, the judge gave us a break to talk with Patrick about whether or not he wished to testify and to talk with his family. And I went outside and talked with his family and came back in and talked with Patrick and told him, basically, I'm sure. I don't remember exactly, but I'm sure I would have told him that I thought that the rape coming in front of the jury would be very, very harmful to him. And the question was, does he think that his testimony could—could add a lot to this that the rape would not take away from it. And—or we are in good enough position right here to go forward, with something, arguing for manslaughter or some reduced mens rea for a lesser offense. And so, that's—that's what I did. I told Patrick what his family suggested, too. I think none of us thought that it would be beneficial for the rape charge to come in front of the jury.

(Post-Conviction Hr'g Tr. 37-38, *Trawick v. State,* No. 02-08616 (Shelby Cnty. Crim. Ct.), ECF No. 11-18.)

Massey testified that, if the rape charge were not admissible, "I think Patrick would have testified then. I know he—he would have wanted to have testified." (*Id.* at 38.) In response to what his advice would have been, Massey replied that "I wouldn't have minded him testifying." (*Id.* at 39.) Massey appeared reluctant to state that he would have advised Trawick to testify. Upon being pressed further, he testified as follows:

> Q. What would you have advised him to do whether to testify or not to testify?
>
> A. I wouldn't say that he shouldn't, I don't think, just based on the burglary, the other felony that he had. You know, I think I would have told him

that it's purely his call and I wouldn't caution him, you know, I wouldn't be against it.

> Q. You wouldn't advise him whether you thought that it would be to his benefit or not to testify?

> A. No, I think it would have probably, under that situation, been to his benefit.

> Q. Well, would you have advised him to testify?

> A. I would have told him I thought it would—that he could add to this case with his testimony.

(*Id.* at 38-39.)

Massey explained that the problem with the case was that the shooting was caught on videotape. (*Id.* at 39-40.) Turner's testimony removed any doubt that Trawick was the person who had shot at the car and had followed the victim into the Mapco and shot her. (*Id.* at 40-41.) By the close of the State's case, the only issue was Trawick's mental state at the time of the shooting. (*Id.* at 40, 41.) Massey argued during closing arguments that the shooting was done in the heat of passion. (*Id.* at 41.)

Despite the importance of Trawick's state of mind, Massey reiterated that, in his opinion, it was not in Trawick's best interest to testify because of the effect the rape conviction would likely have on the jury:

> I don't have an independent recollection but I would think that what I would tell Patrick is I don't think that what you've got to say in light of the video can add to enough to make a difference for what the rape conviction would take away. I think the rape conviction would have been more detrimental than his testimony would have helped.

(*Id.* at 42.) Massey remained unwilling to state clearly that, if the rape conviction had not been admissible, he would have advised Trawick to testify:

I would have to go back and reconstruct this. It's not quite a fair question. Now, with the benefit of hindsight, I guess, I may have said, you know, Patrick if you want to add to this, at least they don't have the detraction of the rape, so if you want to tell your story, hop up there and tell it. Wouldn't have a problem with Patrick telling his story. I told the story on—in the motion for new trial so that we could show prejudice.

(*Id.* at 43-44.)

In response to whether trial counsel believed that his defense strategy had any chance of success, Massey testified that "I made the only argument that I knew how to make. Now if there's a different one to make then go for it." (*Id.* at 51.) Post-conviction counsel asked whether a better defense would have been that "his girlfriend who pimps out young girls is telling him that he's—that she's letting his nine month old daughter have sex with adult men and that her mouth is getting raggedy from giving oral sex with young men." (*Id.*) The post-conviction court asked Trawick's attorney how he anticipated getting that evidence in because Trawick would lack personal knowledge and any testimony about what a third party told him would have been hearsay. (*Id.* at 51-52.) Brooks replied that "[w]e're not trying to prove that she did that. We're trying to show what his mental state was." (*Id.* at 52.)[11] The post-conviction court concluded that "[y]ou've had your client testify and he said what he would have attempted to have testified to and I'm probably going to find as a matter of fact that much of that would not have been allowed, but some of it would have." (Post-Conviction Hr'g Tr. 53, *Trawick v. State,* No. 02-08616 (Shelby

---

[11] Massey was not asked whether he was aware of the substance of Trawick's intended testimony when he advised him not to testify. In its order denying post-conviction relief, the post-conviction court stated that "Petitioner apparently never told his trial attorney about the allegations of child abuse." (Order Denying Pet. for Post-Conviction Relief at PageID 1360, *Trawick v. State,* No. 02-08616 (Shelby Cnty. Crim. Ct.), ECF No. 11-16.) Trawick's sister, Takesha Smith, who testified at the sentencing phase of Trawick's trial, also did not tell trial counsel what she had heard about the victim's use of young girls and her abuse of Trawick's child. (*Id.* at PageID 1359.) Trawick has not challenged these factual findings.

Cnty. Crim. Ct.), ECF No. 11-18.)   The court also observed that, if Massey had conceded that he had made a mistake and should have advised Trawick to testify, that would have been very powerful evidence.   (*Id.* at 55.)   However, the post-conviction court concluded that "he hasn't said that. . . .   I'm finding that you have given him every opportunity to do so and he has not done that."   (*Id.* at 55-56.)

Post-conviction counsel stipulated "that Mr. Massey is one of the finest criminal defense lawyers in Shelby County with a long and distinguished record which is unmatched by any other lawyer in the county."   (*Id.* at 57.)

Trawick has not satisfied his burden of demonstrating that the decision of the TCCA that he failed to show deficient performance was an unreasonable application of *Strickland v. Washington* or was based on an objectively unreasonable factual finding.   Massey, an experienced trial attorney, was fully familiar with the evidence that the State had introduced at trial and had discussed with Trawick and his family the advisability of his testifying.   Massey believed that, on balance, "I think the rape conviction would have been more detrimental than his testimony would have helped."   (Post-Conviction Hr'g Tr. 42, *Trawick v. State,* No. 02-08616 (Shelby Cnty. Crim. Ct.), ECF No. 11-18.)   Although Brooks, who is also an experienced attorney, might disagree with that assessment, the law is clear that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."   *Strickland*, 466 U.S. at 690.

The TCCA's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."   *Richter,* 562 U.S. at 103.   Claim 1 is without merit and is **DISMISSED**.

Because every claim asserted by Petitioner is without merit, the Court DENIES the § 2254 Petition. The § 2254 Petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

## IV.        APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. at 335; *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Cockrell*, 537 U.S. at 336; *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Cockrell*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. *Bradley*, 156 F. App'x at 773.

In this case, there can be no question that the § 2254 Petition is meritless for the reasons previously stated.  Because any appeal by Petitioner on the issues raised in his § 2254 Petition does not deserve attention, the Court DENIES a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.   However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court.   *See* Fed. R. App. P. 24(a) (4)-(5).   In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith.   It is therefore **CERTIFIED**, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is **DENIED**.[12]

IT IS SO ORDERED.

**s/ S. Thomas Anderson**
S.THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE


Date: January 5, 2016.

---

[12] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order.   *See* Fed. R. App. P. 24(a)(5).